JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HOWARD MOON

**(b)** County of Residence of First Listed Plaintiff: Camden County, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kasturi Sen, Esquire and John L. Hensler, Esquire
Goldshaw Greenblatt Pierce LLC - Phone: 215-978-9090
Two Penn Center, Suite 1230, 1500 John F. Kennedy Blvd
Philadelphia, PA 19102

## DEFENDANTS

AMERICAN AIRLINES, INC.

County of Residence of First Listed Defendant: ______
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
ADEA, 29 USC. § 623(a) &(d); 42 USC § 1981; Title VII, 42 USC § 2000e-2(a)&2000e-3(a); ADA, 42 USC § 12203; FMLA 29 USC § 2615; PHRA, 43 P.S. § 955(a)&(d).

Brief description of cause:
Race and age-based discrimination and retaliation; disability-based and FMLA retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ______ DOCKET NUMBER ______

DATE: Sep 25, 2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: Philadelphia Airport - 8500 Essington Avenue Philadelphia, PA 19153-3755

***RELATED CASE IF ANY:*** Case Number:______________________ Judge:________________________________

1. Does this case involve property included in an earlier numbered suit? Yes ☐
2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit? Yes ☐
3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit? Yes ☐
4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual? Yes ☐
5. Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation. Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☑ **is not** related to any pending or previously terminated action in this court.

**Civil Litigation Categories**

***A. Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts)
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☑ 8. Employment
- ☐ 9. Labor-Management Relations
- ☐ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief ***see certification below***
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:______________________________

**B. *Diversity Jurisdiction Cases:***

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury (*Please specify*):________________
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*_____________ ______________________

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☑ **does not** have implications beyond the parties before the court and ☐ **does** / ☑ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☑ Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐ None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| HOWARD MOON,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES INC.<br><br>Defendant. | Civil Action No. __________<br><br>COMPLAINT AND JURY DEMAND |

**<u>COMPLAINT</u>**

**INTRODUCTION**

Howard Moon ("Plaintiff") did his job, spoke up, and paid the price. Moon was a successful 68-year-old African American manager at Defendant American Airlines, Inc.'s ("AA" or "Defendant") Philadelphia International Airport who performed well, received positive recognition, and helped generate substantial operational savings until his new younger white supervisor, Caleb Stevens, began pushing him out by treating him differently than his white, younger peers. Stevens started his campaign against Moon by excluding him from team meetings with his white colleagues, giving him lower pay raises than younger colleagues, giving him less support, and saddling him with a brutal swing schedule, despite Moon's documented health issues and despite offers by a younger peer to assume the swing schedule.

When Moon attempted to move away from Stevens and transfer to other positions within AA, each transfer or promotion was blocked. When Moon repeatedly called out what he believed were age and race-based adverse decisions by Stevens and failures to accommodate his disabilities, Stevens retaliated by manufacturing discipline and, most egregiously, by finally conducting a bogus investigation that provided a pretext for shifting blame to Moon for the flight delays

precipitated by an operational emergency—delays that were in fact caused by Stevens's own failures as a manager to properly schedule staff—and using that pretext to justify Moon's termination.

## FACTUAL ALLEGATIONS

1. This is an employment discrimination and retaliation action arising from AA's treatment of Plaintiff, a 68-year-old African-American manager who worked at AA's Philadelphia International Airport operation from September 6, 2022, until his termination in October 2024.

2. Plaintiff was an experienced manager with approximately fourteen years of leadership experience, an M.B.A. from Villanova University, and a Bachelor of Science degree with honors from the University of Delaware. He performed successfully, received recognition from managers, peers, and direct reports, and generated substantial operational savings for AA.

3. After Caleb Stevens, a white manager then in his late twenties, assumed supervision of Plaintiff in approximately March 2023, Plaintiff was paid less than younger managers, excluded from important communications that white managers attended, placed on a uniquely punishing swing schedule, denied multiple internal transfers that went to less qualified, younger applicants, and subjected to escalating scrutiny and discipline.

4. Starting in April 2023, Plaintiff repeatedly complained that he was being treated differently because of his age and race. He also sought leave because his prostate and lower-back conditions were being aggravated by the schedule, advised Stevens that he was considering FMLA leave, obtained approved intermittent FMLA leave, and opposed race discrimination directed at Black employees and managers by a favored white coworker.

5. Rather than correct the discrimination and working conditions, AA escalated its treatment of Plaintiff. It issued a false counseling memorandum, rejected multiple internal job applications that would have led to a steady work schedule and increase in pay, increased his workload and double-shift demands, suspended him, and ultimately terminated him after blaming him for staffing consequences arising from an airport operational emergency despite his extensive efforts to prevent and address those staffing shortages in real time. In reality, it was Stevens who was responsible for these shortages, having failed to appropriately staff each successive schedule of AA ground-staff.

6. Plaintiff seeks relief for age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), and the Pennsylvania Human Relations Act ("PHRA"); race-based discrimination and retaliation under Section 1981 of the Civil Rights Act of 1866 (“Section 1981”), Title VII of the Civil Rights Act of 1964 ("Title VII") and the PHRA; disability-related retaliation under the Americans with Disabilities Act ("ADA") and the PHRA; and retaliation under the Family and Medical Leave Act ("FMLA").

**JURISDICTION AND VENUE**

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the ADEA; Section 1981, 42 U.S.C. § 1981; Title VII, 42 U.S.C. §§ 2000e *et seq.*; the ADA, 42 U.S.C. §§ 12101 *et seq.*; and the FMLA, 29 U.S.C. §§ 2601 *et seq.* This Court has supplemental jurisdiction over Plaintiff’s related claims under the PHRA, 43 P.S. §§ 951 *et seq.*, pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this District because a substantial part of the events and omissions giving rise to Plaintiff’s claims occurred at Defendant’s operations at Philadelphia

International Airport, within the Eastern District of Pennsylvania, and Plaintiff worked for Defendant in this District.

9. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 530-2024-09092, on January 23, 2025. The Charge was cross-filed with the Pennsylvania Human Relations Commission ("PHRC") and alleged, among other things, age, race, disability-related and retaliatory discrimination. More than one year has elapsed since the Charge was filed with the PHRC, and the PHRC has not entered into a conciliation agreement to which Plaintiff is a party. Plaintiff therefore may pursue his PHRA claims notwithstanding that the PHRC has not issued a right-to-sue notice. *See* 43 P.S. § 962(c)(1); *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471, 476 (3d Cir. 2001). The EEOC issued Plaintiff a Notice of Right to Sue on July 20, 2026. This action is timely.

## PARTIES

10. Plaintiff Howard Moon is an African American man who was 68 years old at the time of the termination challenged in this action. At all relevant times, Plaintiff was employed by Defendant American Airlines, Inc. at Philadelphia International Airport.

11. Defendant American Airlines, Inc. is a corporation operating under the laws of the Commonwealth of Pennsylvania that conducts substantial business in Pennsylvania, including through AA's operations at Philadelphia International Airport. At all relevant times, Defendant was an employer within the meaning of the ADEA, Title VII, the ADA, and the FMLA.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Successful Employment and Stevens's Assumption of Supervision

12. Cole Molzahn, AA's Acting Director of Hub Administration, hired Plaintiff on September 6, 2022, as a Level 3 Customer Service Manager ("CSM")—Staffing for Customer

Care and Customer Operations (Fleet) at Philadelphia International Airport, at an annual salary of $67,000.

13. At the time of his hire, Molzahn promised Plaintiff that Plaintiff would receive at least one day off each weekend, and a steady morning schedule. While Molzahn supervised Plaintiff, he honored his promises.

14. Plaintiff's team was responsible for ensuring adequate daily ground staffing for Fleet Services and Customer Care, including administering voluntary overtime and, when necessary, issuing mandatory same-day overtime ("mandos") in accordance with seniority and AA's procedures given daily projected flight volume.

15. For approximately the first eight or nine months of his employment, Plaintiff performed successfully while under Cole Molzahn's supervision. Plaintiff had six Staffing Assistants reporting to him, and, consistent with agreed upon hiring terms, maintained a consistent 7:00 a.m. to 3:00 p.m. schedule Sunday through Thursday. He consistently received positive feedback on his performance.

16. In approximately February or March 2023, Molzahn was replaced by Caleb Stevens, a white man in his late twenties who had less than three years of leadership experience, and whose highest educational level was a Bachelor's degree in Aeronautical Management Technology--. Stevens had been elevated from a Level 3 CSM role in Phoenix to a Level 5 Manager position in Philadelphia.

17. Once Stevens assumed supervision, he routinely excluded Plaintiff from important communications and decisions but collaborated with younger white counterparts in similar roles, James Roberts and David Baumgardner.

**B. Disparate Pay, Scheduling, and Treatment Based on Age and Race**

18. In April 2023, Stevens awarded Plaintiff a 2.2.2% raise, while younger white CSMs supervised by Stevens received substantially larger increases. Upon information and belief, Baumgardner, received a 5% raise and earned significantly more than Plaintiff for substantially the same work. Roberts, who was never officially assigned to a CSM-Staffing position, but who began learning and discharging those duties as of July 2023, earned still more.

19. Plaintiff complained to Stevens's supervisor, Johnny Nash, Director of Hub Administration, about the discriminatory pay raise, but Nash did nothing to rectify the disparity.

20. In July 2023, with less than four months in his new role, Stevens restructured the Staffing Desk, removed the CSM-Staffing managers' direct reports, physically separated the Staffing Assistants from CSM-Staffing managers, and began creating scheduling bids without meaningful input from Plaintiff while relying on his younger, white counterparts: Baumgardner and Roberts.

21. After Baumgardner left the department in approximately September or October 2023, Maceo Jamison, a person of color who was then approximately 28 years old, became one of Stevens's direct reports. Plaintiff trained Jamison on how to perform many of his duties.

22. Stevens then reassigned Plaintiff's longstanding steady schedule to Jamison and assigned Plaintiff to a swing schedule consisting of 12:30 p.m.–8:30 p.m. shifts on Sunday and Monday, a 9:00 a.m.–5:30 p.m. shift on Tuesday, and 4:00 a.m.–12:30 p.m. shifts on Friday and Saturday.

23. Plaintiff promptly complained that the swing schedule was unhealthy and particularly difficult for him given his age and medical conditions.

24. He escalated the matter to Nash, complaining that Stevens was attempting to force him out by subjecting him to an unsustainable swing schedule, given his age and health conditions. Nash told Plaintiff that he does not get involved in such matters but advised him to find someone else who could replace him on the schedule and suggest a swap to Stevens.

25. Accordingly, Plaintiff proposed to Stevens a schedule swap with Jamison that Jamison had agreed to accept. Stevens rejected the proposal and mocked Plaintiff's age-related concern by comparing him to a Staffing Assistant in her seventies who had complained about being assigned to a night shift, stating, in substance, "Now you're being like Margie!"

26. Plaintiff repeatedly told Stevens over the ensuing months that the swing schedule was aggravating his prostate condition and lower-back pain, causing urinary symptoms, infections, and increased need to take sick leave. Stevens acknowledged hearing the complaints but refused to modify the schedule.

27. Plaintiff again complained to Nash in late 2023 that Stevens was excluding him and Jamison from key meetings, elevating Roberts to Acting Manager on Duty when Stevens was unavailable and otherwise treating Roberts preferentially. Plaintiff told Nash: "It looks bad Johnny – me and Maceo are the two guys who are black." Nash responded: "I don't think it's that." Nash told Plaintiff, he would "look into it," but once again, took no meaningful steps to redress the discrimination.

28. During the same period, younger managers under Stevens received steady schedules and more favorable treatment.

29. Thereafter, Plaintiff was subjected to greater scrutiny by Stevens despite consistently reporting to work on time and performing substantial additional work.

**C. Plaintiff's February 2024 Medical/FMLA Activity and the March 29 Counseling Memorandum**

30. On February 23, 2024, Stevens asked Plaintiff to cover for Roberts the following day, requiring Plaintiff to work a 16-hour shift from approximately 4:00 a.m. until 8:00 p.m.

31. Plaintiff told Stevens that he was having trouble urinating and was experiencing back and side pain, that his condition was flaring, and that he was considering applying for FMLA leave. Plaintiff explained that, given his condition, the most he could safely do was work until 4:00 p.m. Plaintiff thereby sought a modification of the requested schedule because of his medical condition and placed AA on notice of his need for medical leave.

32. Stevens agreed that Plaintiff would work until 4:00 p.m. on February 24. AA's timekeeping system reflected Plaintiff's regular shift and scheduled overtime ending at approximately 4:00 p.m.

33. Nevertheless, on February 26, 2024, Stevens falsely accused Plaintiff of leaving early on February 24 and of failing to communicate adequately, even though Plaintiff had worked until the agreed-upon time and had made the required notifications.

34. Given the flare-up of his condition and related treatment and testing, Plaintiff could not report to work from February 27, 2024 – March 2, 2024, and provided Stevens with a physician's note accordingly.

35. On March 16, 2024, AA approved Plaintiff for intermittent FMLA leave, and Stevens was notified of that approval the same day.

36. After Plaintiff sought medical accommodation/leave and obtained FMLA protection, Stevens' retaliatory treatment of Plaintiff intensified.

37. On March 29, 2024, Stevens issued Plaintiff a written "Performance Counseling Letter" accusing Plaintiff of leaving early on February 24 and failing to communicate and

collaborate appropriately. Stevens copied HR Business Partners on the memorandum, despite knowing that Plaintiff had applied for a manager—HR Business Partner position the prior month.

38. On March 30, 2024, Plaintiff submitted a detailed written rebuttal to the Performance Counseling Letter with supporting documentation. Plaintiff expressly complained that, as a senior citizen employee, AA was disregarding his health limitations by requiring him to work swing shifts and double-shifts and complained that the counseling memorandum appeared designed to impede his career advancement and to lay a foundation for terminating him.

39. Plaintiff requested that the counseling memorandum be removed from his personnel file. Stevens refused to do so.

**D. Plaintiff's April 2024 Race, Age and Disability-Based Complaints to Human Resources**

40. Shortly after the Performance Counseling Letter was issued, Plaintiff approached Nash again and complained of Stevens' latest misconduct, and of his belief that the disciplinary memo was directly linked to Plaintiff's age, age-related health conditions, and the resultant FMLA leave that Plaintiff had been approved for. This time, Nash told Plaintiff to take his complaints to Human Resources.

41. On April 2, 2024, Plaintiff met with HR Business Partner Amber Harris and complained that Stevens was discriminating against him because of his age, race and medical conditions, including by subjecting him to a uniquely punishing schedule and favoring Roberts, a significantly younger white employee.

42. Harris agreed that the March 29 counseling memorandum should not have been issued and asked Plaintiff how he wished to proceed. Plaintiff requested, at minimum, that it be removed from his personnel file so that it would not interfere with his internal job applications and opportunities.

43. Harris later informed Plaintiff that Stevens had refused to remove the memorandum. AA took no effective corrective action.

**E. Plaintiff's Attempts to Transfer to other Positions within AA that would have provided a Steady Schedule and Pay Raises**

44. Plaintiff was not interviewed for the Manager—HR Business Partner position for which he had applied in February 2024 (Req. 71659). At Harris's urging, Plaintiff submitted another application for a manager—HR Business Partner position on May 14, 2024 (Req. 73043) and again was not interviewed. This position entailed a very significant pay raise.

45. On March 29, 2024, Plaintiff applied for the CSM—Control Center position. Although the position was at the same level as his then current position, it carried significantly higher compensation and a steady schedule.

46. The hiring manager, David Gomez, had invited Plaintiff to apply for the position stating that he wanted Plaintiff to fill the open slot. Nevertheless, Plaintiff was never interviewed for the position. Gomez subsequently told Plaintiff that Plaintiff's application had been "blocked" and had never reached him.

47. According to AA's position statement to the EEOC, the position was awarded to a 29-year-old white AA candidate with *no experience in the airlines industry, but a recently obtained MBA degree*.

48. Plaintiff, by contrast, had earned his MBA in 2004 from Villanova University, and had nearly 16 years of leadership/managerial experience including 1.5 years of experience at AA in a parallel CSM role. He was obviously the more qualified candidate.

**F. Continued Age-Based Pay Disparity and Increased Workload**

49. In approximately April 2024, Stevens gave Plaintiff a meager 1.49% annual raise despite Plaintiff having meet or exceeded established performance goals and despite his having generated substantial savings for AA, including through his handling of volunteer time-off and overtime management programs.

50. Plaintiff again complained to Stevens that his raise was unfair compared with younger managers. Upon information and belief, Jamison (in his twenties), who Plaintiff had helped train, received approximately a 2.75% raise. Upon information and believe, another much younger CSM-Allocator, David McDaniels (also, in his twenties), who had been hired just a few months before Plaintiff, had risen within two years from a starting salary of approximately $63,000 to approximately $82,000 by 2024, while Plaintiff's salary remained $69,400.

51. Plaintiff complained to Nash—yet again—this time, about the second, discriminatory pay raise, the retaliatory counseling memo, the continued discrimination in scheduling, and the repeated denials of internal job applications. Plaintiff told Nash that he was being subjected to discrimination because of his age, health-related conditions, race and because he was taking intermittent FMLA leave. Once again, Plaintiff told Nash that he believed that Stevens was trying to force him to resign. Once again, Nash did nothing to protect Plaintiff.

52. After Plaintiff's complaints, Stevens increased the workload of the CSM-Staffing managers by assigning them responsibility for approving large volumes of same-day overtime exceptions previously handled by numerous other Level 3 managers.

53. Roberts did not perform his share of the expanded work, and a disproportionate amount of the work fell to Plaintiff. Jamison became overwhelmed by the increased workload and ultimately resigned in August 2024.

**G. Plaintiff's Opposition to Race Discrimination in June 2024**

54. During spring 2024, Plaintiff learned that Black union representatives and Black managers had repeatedly complained that Roberts treated Black employees unfairly in connection with overtime opportunities and approvals. Plaintiff was also aware of multiple racially derogatory comments Roberts had allegedly made about Black employees and managers.

55. Among other incidents, Plaintiff learned that Roberts had compared a Black employee to a racialized cartoon character, told a Black manager to look for all Black employees in a break room—as though all Black employees were slackers—and, in approximately April 2024, stated that a Black Manager on Duty would be in his office "eating fried chicken."

56. In early June 2024, Roberts sent an inappropriate email to Black CSM-Allocator, Wynton Tompkins. Plaintiff responded by email telling Roberts to stop issuing directives beyond his scope of authority and copied Stevens and HR Business Partner Harris.

57. Plaintiff then requested and attended a meeting with Stevens and Harris. During that meeting, Plaintiff complained that Roberts had a history of making racist comments, had been the subject of race-based complaints made to AA's Ethics hotline, was not timely approving overtime pay for Black employees, was not performing his own work, thereby allowing the burden to fall on him personally, was baselessly and with full support from Stevens, investigating black coworkers—including Plaintiff—for alleged overtime misuse, and was otherwise exceeding the scope of his authority towards his Level 3 black coworkers.

58. Plaintiff's complaint to Harris and Stevens about Roberts and Stevens constituted opposition to conduct that he reasonably believed constituted race discrimination prohibited by Title VII and 42 U.S.C. §1981.

59. Stevens and Harris said they "would get back to" Plaintiff on his complaints but never did.

60. During the charging phase, Plaintiff submitted a sworn declaration from Thompkins noting that Thompkins had made an Ethics complaint about Roberts' racist behavior towards Thompkins, but he was never contacted or interviewed about his complaint by responsible AA employees.

61. Instead, after Plaintiff's June 2024 complaint to Stevens and Harris, Stevens continued to give favored treatment to Roberts including elevating him to acting Manager on Duty in Stevens' absence and by approving Roberts excessive vacation requests during the peak summer period, thereby burdening Plaintiff and Jamison with Roberts' workload.

**H. August 2024 Operational Emergency, Suspension, and Termination**

62. By August 2024, staffing conditions at AA's Philadelphia ground operation were severely strained. Daily mandatory overtime had persisted for months, and the operation was regularly attempting to cover hundreds of overtime hours per day. Mr. Stevens had designed multiple faulty scheduling bids that became progressively worse, under-allocating staff and creating recurring gaps in coverage.

63. Troublingly, the Union contract allowed workers to work with only a 7.5-hour gap between back-to-back shifts. The 7.5- hour gap does not capture the time a worker spends on traveling home and back, after which, an employee might sleep for four or five hours *at best*, in between two sixteen-hour back-to-back shifts. In other words, ground staff workers who were responsible for performing flight safety checks to ensure the safety of thousands of passengers, might get a mere 4-5 hours of sleep in an approximate thirty-six-hour period. And *even without the 7.5-hour break*, they could be forced to work non-stop if the Overtime Call list had been

exhausted and everyone else on the list had turned down overtime. In other words, some AA ground staff were working "short turns" –*shifts that lasted over sixteen hours, typically between twenty-four and thirty-six hours, and, per contract, had to be paid two and a half times their regular rate, and some were making more than 300% of their anticipated annual hourly pay after overtime.*[1]

64. AA ground staff working these very dangerous shifts threatened to compromise overall public safety.

65. Perhaps unsurprisingly, a large number of employees were taking FMLA intermittent leave. This made it even more difficult to get employees to show up for same-day mandatory overtime shifts or short turns, as more employees called out on same-day FMLA intermittent leave after such "mandos" issued.

66. In early August 2024, Stevens scheduled a newly assigned manager, Binod Edavakandam, to the morning shift on August 16, 2024. On that shift, Edavakandam had to handle staffing forecasting for August 17, 2024. Plaintiff warned Stevens that Edavakandam lacked necessary training and offered to alter his own schedule so he could train and assist him. Stevens declined Plaintiff's proposal.

[1] In late 2023/early 2024, Johnny Nash emailed Moon a spreadsheet noting the excessive overtime hours AA ground staff was logging. He followed that up with a discussion with Moon during which Nash shared his concerns about the short turns and told Moon that he (Nash) was under pressure from Julie Rath, Senior VP (Dallas) to restrict their use. Five or ten of the top billers from AA's ground staff were logging approximately *100 hours or more a week*. When Nash asked Moon how staff could possibly cope with these hours, Moon reported that two of the top billers, Fleet Service Agents Chieng Ha and Hadi Yanto, would routinely attempt to take naps in their cars in-between flight arrivals to handle the grueling 24–36-hour shifts. Several of the AA ground staff at the top of the hours' list were making somewhere in the ballpark of $200,000 per year while earning $33.00 per hour (which, without overtime, comes to approximately $66,000 annually at 40 hours per week for 50 of the 52 weeks). He told Nash that Steven's faulty scheduling bids were the issue. In a similar vein, on April 17, 2024, Rath approached Moon at a happy hour before a conference in Dallas, and echoed Nash's sentiment: she told Moon that AA's Philadelphia hub had to get a handle on the short turns. Moon responded that he and his team were doing what they could to remedy the situation, but because of the scheduling bids, this situation had become unavoidable.

67. On August 16, 2024, while working before his scheduled shift start time, Plaintiff reviewed staffing information, attempted to assist Edavakandam, and later issued additional voluntary overtime requests to address forecasted shortages for the next day, August 17, 2024. On August 16, 2024, Plaintiff began work early and worked beyond his scheduled shift. At approximately 8:51 p.m., Stevens asked Plaintiff to add additional voluntary overtime requests; Plaintiff responded that he had already done so and provided the breakdown. Stevens thanked Plaintiff.

68. At 5:30 in the morning on August 17, 2024, Plaintiff once again pitched in, hours ahead of his scheduled start time, to request that additional overtime coverage be assigned. With projected same-day staff shortages, the only recourse was to issue mandos to the already threadbare and overworked team of Fleet Services staff, which Plaintiff did.

69. Later that morning, an AA aircraft struck an AA tug, and the tug operator jumped out, narrowly escaping with his life, creating a serious operational emergency, employee disruption, and unavoidable flight delays.

70. Plaintiff worked with other managers for hours to address the emergency and staffing consequences, sought assistance from Stevens, and ultimately worked approximately 16.5 hours that day after having worked more than 11 hours the day before.

71. Despite Plaintiff's extraordinary efforts, on August 23, 2024, Stevens suspended Plaintiff with pay and launched a sham investigation into company-rule violations connected to staffing on August 17, 2024.

72. The August 17, 2024, flight delays gave Stevens the cover he needed to finally fire Plaintiff.

73. AA never interviewed or otherwise contacted Plaintiff during the purported investigation to afford him any opportunity to present documentary evidence demonstrating his efforts to prevent and address the staffing shortage.

74. On October 3, 2024, Stevens informed Plaintiff that AA was terminating his employment. AA accused Plaintiff of failing to maintain proper staffing levels and failing to collaborate with upper leadership, despite the fact that Plaintiff had proactively addressed the shortages, all mandatory requests he prepared were in collaboration with, and approved by, upper management, and Plaintiff had sought Stevens's help during the emergency.

75. AA's stated reasons for the termination were false and pretextual. Plaintiff's termination followed his repeated age-discrimination complaints, his request for disability-related schedule relief, his notice and use of FMLA-protected leave, and his June 2024 complaint opposing race discrimination by Stevens' favored white manager, James Roberts.

76. Plaintiff's employment ended on or about October 4, 2024.

**<u>COUNT I</u>**

**AGE DISCRIMINATION — ADEA, 29 U.S.C. § 623(a), AND PHRA, 43 P.S. § 955(a)**

77. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

78. At all relevant times, Plaintiff was over 40 years old and therefore protected by both the ADEA and the PHRA.

79. Plaintiff was qualified for the CSM—Staffing position and the CSM—Control Center and HR Business Partner positions for which he applied and performed his work satisfactorily or better.

80. AA subjected Plaintiff to adverse employment actions because of his age, as evinced by his disparate compensation, a uniquely onerous schedule, a bogus performance counseling memo, denial of the CSM—Control Center opportunity and/or the HR Business Partner positions and his termination...

81. AA discriminated against Plaintiff based on his age, as shown by Stevens's age-related comment, discriminatory schedules, raises, exclusion from key communications, the issuance of a false counseling memorandum, intensifying Plaintiff's workload and double-shift demands, denying him internal promotions/transfer, subjecting him to harsher scrutiny, and ultimately, suspending and firing Plaintiff.

82. AA showed malice and reckless indifference with respect to Plaintiff's rights.

83. As a direct and proximate result of Defendant's violations of the ADEA and PHRA, Plaintiff has suffered and continues to suffer lost wages, emotional distress, humiliation and embarrassment, loss of enjoyment of life, physical manifestations of stress, damage to professional reputation and/or other compensatory and recoverable damages.

**<u>COUNT II</u>**

**AGE-BASED RETALIATION — ADEA, 29 U.S.C. § 623(d), AND PHRA, 43 P.S. § 955(d)**

84. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

85. Plaintiff engaged in activity protected under the ADEA and PHRA by opposing age discrimination, including:

a. his complaint to Nash in April 2023 of the discriminatory pay raise he received;
b. his complaints to Stevens that the grueling swing schedule he was being put under was not sustainable at his age and his medical conditions, starting in mid-2023 and continuing until he was suspended and then fired a little over a year later;

c. his complaint to Nash in September/October 2023 that Stevens was attempting to force him out by subjecting him to an unsustainable swing schedule, given Plaintiff's age and age-related health conditions.

d. his request for an accommodation to Stevens that he could not work a double shift on February 24, 2024, due to his age-related medical conditions;

e. his complaints to Nash that Stevens was targeting him for his age and age-related health conditions in late March/early April 2024.

f. his complaints to Stevens and written rebuttal that the March 29, 2024, counseling memorandum from Stevens was designed to force him out of AA and discriminated against him based on his age and his medical conditions;

g. his complaint to his HR Business Partner Amber Harris on April 2, 2024, that Mr. Stevens was discriminating against him on the basis of his age, medical conditions and race and continued follow up with Harris;

h. his complaint to Stevens in April 2024 that his pay raise was discriminatory compared to his white and younger comparators; and

i. his complaint to Nash in April 2024 of the discriminatory pay raises, retaliatory counseling memo, scheduling and denials of internal job applications on the basis of his age.

86. After those complaints, AA subjected Plaintiff to escalating retaliation, including Stevens's age-related comment, discriminatory schedules, harsher scrutiny, the issuance of a false counseling memorandum, intensifying Plaintiff's workload and double-shift demands, hiring a 29-year-old with zero airlines experience to fill the CSM—Control Center position instead of Plaintiff, giving Plaintiff a discriminatory pay raise, and ultimately suspending and then terminating his employment.

87. AA is therefore liable to Plaintiff for retaliating against him in violation of the ADEA and PHRA.

88. AA showed malice and reckless indifference with respect to Plaintiff's rights.

89. As a direct and proximate result of Defendant's violations of the ADEA and PHRA, Plaintiff has suffered and continues to suffer lost wages, emotional distress, humiliation and embarrassment, loss of enjoyment of life, physical manifestations of stress, damage to professional reputation and/or other compensatory and recoverable damages.

## COUNT III

## RACE-BASED DISCRIMINATION — SECTION 1981, 42 U.S.C. § 1981; TITLE VII, 42 U.S.C. § 2000e-2(a); AND PHRA, 43 P.S. § 955(a)

90. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

91. Plaintiff is African American and is protected against race discrimination under Section 1981, Title VII and the PHRA.

92. Plaintiff was qualified for the CSM—Staffing position and the CSM—Control Center and HR Business Partner positions for which he applied and consistently performed his work satisfactorily or better.

93. AA subjected Plaintiff to adverse employment actions because of his race, as evinced by his disparate compensation, a uniquely onerous schedule, a bogus performance counseling memo, denial of the CSM—Control Center opportunity and/or the HR Business Partner positions and his termination.

94. AA acted intentionally and with malice or reckless indifference to Plaintiff's rights.

95. As a direct and proximate result of AA's race discrimination, Plaintiff has suffered and continues to suffer lost wages, emotional distress, humiliation and embarrassment, loss of enjoyment of life, physical manifestations of stress, damage to professional reputation and/or other compensatory and recoverable damages.

**COUNT IV**

**RACE-BASED RETALIATION —**

**Section 1981, 42 U.S.C. § 1981,**
**TITLE VII, 42 U.S.C. § 2000e-3(a), AND PHRA, 43 P.S. § 955(d)**

96. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

97. Plaintiff engaged in activity protected under Title VII, 42 U.S.C. § 1981 and the PHRA by opposing race discrimination, including:

a. His 2023 complaint to Nash that Stevens was favoring Jim Roberts over Plaintiff and Maceo Jamison because the latter two were black;
b. His April 2, 2024, complaint to HR Business Partner Harris that Stevens was discriminating against him because of his race while favoring Roberts, a white employee;
c. His April 2024, complaint to Nash about continued discrimination in scheduling, and repeated denials of his applications for transfers/promotions to open internal job postings; and His June 2024, complaint to Stevens and Harris of conduct that Plaintiff reasonably believed constituted race discrimination against Black employees and managers by Roberts, including Roberts' racially derogatory comments, harassment, and Roberts' baseless investigation into Black managers' use of overtime (including Plaintiff), which investigation was sanctioned by Stevens.

98. After Plaintiff's race-discrimination complaints, AA subjected him to retaliation by increasing his workload to accommodate Robert's excessive vacation requests, subjecting him to increased and continued scrutiny and scheduling demands, then suspending him on August 23, 2024, and terminating him in October 2024 on pretextual grounds.

99. AA showed malice and reckless indifference with respect to Plaintiff's rights.

100. As a direct and proximate result of Defendant's violations of Section 1981, Title VII and the PHRA, Plaintiff has suffered and continues to suffer lost wages, emotional distress,

humiliation and embarrassment, loss of enjoyment of life, physical manifestations of stress, damage to professional reputation and/or other compensatory and recoverable damages.

## COUNT V

## DISABILITY RETALIATION — ADA, 42 U.S.C. § 12203, AND PHRA, 43 P.S. § 955(d)

101. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

102. Plaintiff engaged in protected activity under the ADA and PHRA when he:

a. Repeatedly complained to Stevens that the grueling swing schedule he was being subjected to was not sustainable at his age and his medical conditions, which complaints started in June 2023 and continued until he was suspended and then fired a little over a year later;

b. complained to Nash in September/October 2023 that Stevens was attempting to force him to resign by subjecting him to a grueling swing schedule, that was not sustainable given his age and health conditions;

c. advised Stevens that he could not work a double shift on February 24, 2024, due to his age-related medical conditions and asked that Stevens accommodate his need for a shorter overtime shift;

d. complained to Stevens in writing that the March 29, 2024, counseling memorandum from Stevens was designed to force him out of AA and discriminated against him based on his age and his medical conditions;

e. complained to Nash in late March/early April that Stevens was targeting him for his age-related medical conditions;

f. complained to his HR Business Partner Amber Harris on April 2, 2024, that Stevens was discriminating against him on the basis of his age, medical conditions and race; and

g. complained to Nash about the second, discriminatory pay raise, the retaliatory counseling memo, the continued discrimination in scheduling, and the repeated denials of internal job transfers/promotions for which he had applied.

103. After those complaints, AA subjected Plaintiff to escalating retaliation, including saddling him with discriminatory work schedules, subjecting him to harsher scrutiny, issuing him a false counseling memorandum, intensifying his work load and double-shift demands, hiring a 29-year old with zero airlines experience to fill the CSM—Control Center position instead of him, giving him a discriminatory pay raise, and ultimately suspending and then terminating his employment as set forth in the preceding paragraphs of this Complaint.

104. AA showed malice and reckless indifference with respect to Plaintiff's rights.

105. As a direct and proximate result of Defendant's violations of the ADA and PHRA, Plaintiff has suffered and continues to suffer lost wages, emotional distress, humiliation and embarrassment, loss of enjoyment of life, physical manifestations of stress, damage to professional reputation and/or other compensatory and recoverable damages.

**COUNT VI**

**FMLA RETALIATION — 29 U.S.C. § 2615**

106. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

107. Plaintiff was an eligible employee within the meaning of the FMLA and was approved by AA for intermittent FMLA leave on March 16, 2024.

108. Plaintiff engaged in protected FMLA activity by notifying Stevens on February 23, 2024, that he was considering and needed FMLA-approved medical leave, providing AA with medical documentation, obtaining approval for intermittent FMLA leave, and exercising or attempting to exercise FMLA rights.

109. Plaintiff further engaged in protected FMLA activity when he complained to Nash in late March/ early April 2024, to Harris in April 2024, and to Nash---again—in April 2024, that Stevens was targeting him because he (Moon) had been approved for intermittent FMLA leave.

110. AA knew of Plaintiff's protected FMLA activity, because Stevens received notice of Plaintiff's approved intermittent leave, Plaintiff complained to Nash and Harris that Stevens was retaliating against him because of his leave approval, and because Plaintiff took intermittent FMLA leave on multiple occasions in 2024 after he received AA approval to do so, with Stevens's knowledge.

111. In retaliation, AA issued Plaintiff the March 29, 2024, counseling memorandum based on the very shift as to which Plaintiff had disclosed his medical limitations; subjected Plaintiff to harsher scrutiny, intensified his workload and double-shift demands, hired a 29-year-old with zero airlines experience to fill the CSM—Control Center position over Plaintiff, gave Plaintiff a discriminatory pay raise, and ultimately suspended and then terminated his employment

112. As a direct and proximate result of Defendant's violations of FMLA, Plaintiff has suffered and continues to suffer lost wages, emotional distress, humiliation and embarrassment, loss of enjoyment of life, physical manifestations of stress, damage to professional reputation and/or other compensatory and recoverable damages.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant and award all relief permitted by law, including:

i. A declaratory judgment that Defendants' acts have violated Plaintiffs' rights as secured to them by law.
ii. Actual damages, including lost wages and benefits, including retirement benefits and pensions,
iii. Compensatory damages;
iv. Liquidated damages;
v. Punitive damages;
vi. Statutory penalties;
vii. Attorneys' fees;

viii. Litigation costs;

ix. Such additional relief as the Court deems just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**Date:** September 25, 2026

Respectfully submitted,

**GOLDSHAW GREENBLATT PIERCE LLC**

Kasturi Sen (PA Bar No. 209351)
John L. Hensler (PA Bar No. 329075)
Two Penn Center, Suite 1230
1500 John F. Kennedy Boulevard
Philadelphia, PA 19102
ksen@ggplawfirm.com
jhensler@ggplawfirm.com
*Attorneys for Plaintiff*